IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

NIDAL KAHL,                                    )
and PANAYIOTA KAHL,                            )
                                               )
              Plaintiffs,                      )    TC-MD 230009R
                                               )
       v.                                      )
                                               )
DEPARTMENT OF REVENUE,                         )
State of Oregon,                               )
                                               )
              Defendant.                       )    **DECISION**

Plaintiffs Nidal Kahl (Kahl) and Panayiota Kahl appeal Defendant's Notices of

Assessment dated October 12, 2022, for the 2015 and 2016 tax years (Notices).[1]  Defendant

submitted a cross-claim, asking for additional tax, penalty, and interest greater than the amounts

shown in the Notices.  (Def's Mot at 2.)

Based on some common business ownership interests, a joint trial was held with *Daniel

Kahl v. Department of Revenue*, TC-MD 230011R and *Edward Kahl v. Department of Revenue*,

TC-MD 230010R.  Trial was held in the Oregon Tax Court from January 27, 2025, through

January 31, 2025, and on February 5, 2025.  An additional trial date for Daniel Kahl was held

remotely on May 20, 2025.  Hertsel Shadian, Attorney at Law, represented Kahl and Panayiota

Kahl, and co-represented Daniel Kahl.  Shawn Bargouti (Bargouti), Certified Public Accountant

(CPA), represented Edward Kahl and co-represented Daniel Kahl.  Kahl and Bargouti testified

on behalf of Plaintiffs.  Plaintiffs also called Defendant's auditor, Michelle Warren (Warren), as

---

[1] It is the court's customary practice to refer to individuals by their last name.  Because multiple individuals
have the same last name, in this decision the court will refer to Nidal Kahl as "Kahl" and to other individuals with
the same last name using both their first and last name.  Unless otherwise noted, "Plaintiffs" used plurally refers to
Nidal Kahl, Panayiota Kahl, Daniel Kahl, and Edward Kahl.

an adverse witness. Patrick Rieder and Sam Zeigler, Assistant Attorneys General, represented Defendant and called Warren as a witness. Plaintiffs' Exhibits PE 1 to PE 3763 and PR 1 to PR 13 were admitted into evidence. Defendant's Exhibits DE 1 to DE 3294 and DR 1 to DR 19 were admitted into evidence. Per stipulation of the parties, the court will not consider the additional commentary contained in the rebuttal exhibits and will only focus on the numbers contained therein.

## I. INTRODUCTION

These consolidated appeals presented a substantial challenge for the parties and the court, owing to the transactional density of the evidence. The matters involved eight pass-through business entities associated with multiple taxpayers over two tax years, resulting in tens of thousands of discrete data points potentially subject to evidentiary review.

A significant source of this difficulty stemmed from Plaintiffs' practice of paying expenses of one business entity using the credit card or checking account of another. This intermingling of financial activity created questions about which entity incurred each expense and whether it was ordinary and necessary for that entity's trade or business.

Before trial, the court directed the parties to use Plaintiffs' reconstructed books and Defendant's audit workbooks as the starting point for the presentation of evidence. Defendant's workbooks identified the categories and entries Defendant allowed, disallowed, or continued to dispute. Those workbooks were the organizing framework for the evidentiary presentation. Plaintiffs remained free to challenge Defendant's adjustments, but they were expected to connect their testimony and exhibits to the disputed items in that framework.

/ / /

/ / /

Accordingly, the court conditioned the admission of the 3,763 pages of Plaintiffs' exhibits on using Defendant's spreadsheets as the analytical baseline.[2]  That evidentiary structure shapes how the court evaluates the testimony and records described below.  Due to the extensive nature of the evidence in this matter, the court makes certain initial findings within the next section before conducting its full analysis below.

## II.  STATEMENT OF FACTS[3]

A.      *General Background*

Kahl is a microbiologist and entrepreneur.  He operated or participated in several related businesses during the years at issue, including Biogen Lab Developments LLC (Biogen), Celebrity Tan, LLC (Celebrity Tan) and related entities, Furniture Plus, LLC (Furniture Plus), Kahl and Company, LLC (Kahl and Company), Kahl Properties, LLC (Kahl Properties), Vista Properties, LLC (Vista Properties), and production-related activity associated with Bolt Films LLC (Bolt Films) and Light Up the Sky LLC (Light Up the Sky).  Kahl testified that the businesses were family-connected, that funds sometimes moved among related entities as cash flow needs arose, and that business records were later reconstructed from bank records, credit card statements, receipts, invoices, and other available documents.[4]  Kahl's testimony provided

---

[2] The court conditioned admittance pursuant to ORS 305.501(4)(a) (statutory or technical rules of evidence are not required in the Magistrate Division) and *Reed v. Dept. of Rev.*, 310 Or 260, 270, 798 P2d 235 (1990) (Peterson, J., concurring) (the Tax Court can require a taxpayer "to put the evidence into some minimally coherent form before" its admission).

[3] Because the disputed adjustments arise from numerous transactions across several categories of expenses, the court summarizes the evidence and evaluates the issues by category rather than addressing each transaction individually.

[4] During trial there were several discussions about confidentially of client identities and proprietary business practices and Kahl's concern about the level of disclosure.  The court denied Plaintiffs' request for a protective order of the entire trial as overly broad.  However, the court is sensitive to the proprietary nature of some of the business practices.  Thus, portions of the evidence which appear sensitive, and are not crucial to the decision, are intentionally set forth in less specific terms.

context for the businesses but often did not connect specific disputed entries to a particular client, project, trip, entity, or contemporaneous record.

Kahl testified that he and his brothers, Daniel Kahl and Edward Kahl, were partial owners of these entities. Daniel Kahl managed the operations of Celebrity Tan and a related medical spa. Edward Kahl was minimally involved in those entities during the tax years at issue, despite having some ownership interest. Kahl managed the remaining entities.

1. *Biogen*

During the tax years at issue, Biogen maintained a network of partner laboratories and performed in-house testing, particularly in molecular biology and process validation. Biogen's claimed expenses included travel, lodging, meals, professional dues, laboratory supplies, testing materials, software, communications, and other business expenses.

Kahl testified that business travel was common because he performed inspections, attended meetings, worked with clients, and had obligations related to a business known as Exova. He also testified that some purchases from vendors that could appear personal—such as purchases from restaurants, retail stores, grocery stores, or supplement sellers—could relate to product testing, client investigations, sample collection, or business development activity.

Kahl's testimony was often general rather than transaction specific. For some charges, he identified the vendor and described a likely business purpose. For others, he testified that he would need to review emails or other records, not submitted as trial exhibits, to identify the specific trip, client, project, or purpose.

Kahl testified that his emails were his primary record system for many trips and client projects, but he did not consistently connect those emails or other source records to the disputed entries in Defendant's workbooks.

Biogen's credit cards and accounts were often used for expenses associated with other Kahl family related businesses. Kahl testified that certain charges on Biogen accounts related to Furniture Plus, Celebrity Tan, Bolt Films, and other related entities. There were no formal documents to show which entity incurred the expense, whether the expenses were reimbursed, or to prove the claimed tax treatment for the entity seeking to deduct it.

Warren testified that in 2015, Biogen had no employees and no documentation for lab equipment purchases. She stated that Biogen's operations did not appear to support the significant building-related expenses sought to be deducted as business expenses.

Warren allowed lab fees paid to third-party testing companies where invoices were provided. She disallowed interest expenses on credit cards and loans because she could not determine what portion related to business versus personal use based on commingling of personal and business expenses. She also disallowed outside services where no Forms 1099 were filed and for supplies where receipts were missing or indicated personal use.

Warren testified that Biogen purchased property identified as the "Vista property" in Corbett, Oregon, in January 2016. She observed significant electricity usage beginning in May 2016, averaging approximately 600 kilowatt-hours (kWh) per day, compared to 61 kWh per day earlier in the year. She noted that receipts from Grow World and Mount Hood Garden Supply included items such as grow lights, carbon dioxide regulators, hurricane fans, and turkey bags, which raised questions about whether the property was used for marijuana cultivation rather than Biogen's stated business purpose. She testified that Biogen was not licensed to grow marijuana and that Defendant could not definitively conclude the nature of the activity but considered these facts in disallowing expenses.

/ / /

Warren disallowed depreciation for HVAC and leasehold improvements because invoices were not provided and because similar expenses appeared on other entities' schedules, raising concerns about duplication and commingling. She also disallowed interest and loan fees for the Vista property revolving loan because she could not determine what portion related to business use.

2.      *Vista Properties*

Kahl testified that Vista Properties owned the Vista property, which housed Biogen's laboratory. The property included a former residence and a separate lab building, which were connected and renovated. He testified that the property was acquired from a competitor and was already zoned and equipped for laboratory use. Renovations included electrical upgrades, HVAC work, and tree removal. Vista Properties leased the facility to Biogen. Rent payments were made and accepted by Defendant. Utility expenses for the property were incurred beginning in early 2016. Kahl provided historical billing records from PGE and other providers. Defendant disallowed some expenses due to lack of contemporaneous invoices and suspicion that activities on the property were not related to normal Biogen business operations.

3.      *Celebrity Tan*

Celebrity Tan operated tanning salons and a medical spa. By 2015, the business had three locations: Mall 205, Cascade Station, and Progress Ridge. Each location was kept as a separate entity for liability purposes. Kahl described Celebrity Tan as a corporate or umbrella entity, with individual locations connected to the broader business structure. The Progress Ridge location also housed the medical spa, known as Celebrity Spa. Daniel Kahl managed the day-to-day operations of Celebrity Tan and the spa. Kahl testified that Daniel Kahl was responsible for hiring, vendor management, and overseeing promotional events.

Kahl testified that the business transitioned from tanning to medical spa services due to declining revenues in the tanning industry. The spa offered services such as Botox, laser treatments, and body sculpting, which required licensed medical professionals and a medical director.

The accounting and banking structure did not clearly mirror the legal entity structure. Kahl testified that Celebrity Tan used an OnPoint banking relationship with one main Celebrity Tan account and subaccounts for the different locations. Revenue and expenses could be tracked by account number, but common expenses, advertising, vendors, payroll, and other costs were not always cleanly separated by legal entity or location.

Bargouti later testified that, during the reconstruction of the books, he concluded that the activity was more appropriately organized under the Celebrity Tan EIN, with location-level activity tracked through subaccounts or class accounting. For 2015, however, the original returns had treated the Celebrity Tan locations as separate tax entities. The reconstructed books therefore differed from the original tax returns, particularly in how activity was grouped among the locations.

Defendant used Celebrity Tan as a representative example of how the workbooks were organized. Warren testified that she prepared workbooks using Plaintiffs' reconstructed books as the starting point, added her own analysis to identify allowed and disallowed items, and used color-coded tabs to distinguish categories accepted from the reconstructed books from categories requiring further adjustment.

The Celebrity Tan records showed both substantial business activity and recurring substantiation problems. Many expenses were accepted, and Defendant did not treat the Celebrity Tan records as wholly unreliable. But the workbooks also showed that some claimed

expenses remained disputed because the records did not clearly establish the payor, entity, location, business purpose, or property allocation.

Warren testified that Defendant made no adjustments to income for Celebrity Tan because bank statements matched reported income. However, she noted that Defendant did not receive any point-of-sale system records, limiting verification of cash transactions and purchases. She explained that Defendant disallowed $3,593.45 under Progress Ridge for cost of goods sold, in addition to reductions already made by Plaintiffs. She testified that receipts provided were insufficient because many were paid in cash without proof of reimbursement or business purpose. Without point-of-sale records, Defendant could not verify that cash used for purchases came from reported income.

Defendant partially allowed advertising expenses. For example, Warren allowed payments to TNT Marketing where invoices clearly indicated a business purpose. However, she questioned other advertising expenses, including Facebook charges and a $10,000 payment to Light Up the Sky – a Kahl related company. She testified that Light Up the Sky reported zero income on its return and that the payment appeared to be part of a capital contribution rather than an advertising expense.

Automobile expenses were disallowed due to lack of mileage logs, vehicle identification, and proof of business use, as required under Internal Revenue Code (IRC) section 274(d). Meals and entertainment expenses were disallowed for lack of documentation showing business purpose, attendees, and relationship to the business. Some receipts included personal items and locations unrelated to business operations.

Most rent expenses were allowed where contracts were provided. However, a $6,000 payment to St. John Investments was disallowed because no documentation explained what was

being rented. Warren also disallowed numerous repair and supply expenses for lack of invoices or evidence of business purpose. Some receipts referenced other properties or included items such as water heaters and grow-related supplies, raising questions about their relevance to Celebrity Tan.

Warren testified that the 2016 workbook followed the same structure as 2015. She disallowed expenses for similar reasons: lack of substantiation, failure to file required 1099s, and inability to verify business purpose. Some payroll entries were disallowed because they were not processed through ADP and lacked proof of reporting on W-2 or 1099 forms.

4. *Kahl Properties*

Kahl Properties was one of the related entities involved in property ownership and rental activity. Kahl testified that the related entities owned or used property connected to the businesses, including property associated with Furniture Plus and Biogen. Kahl testified that space at the Furniture Plus location was also used for Biogen office or storage purposes, and Bargouti testified that certain payments among the entities were treated as rent expense by the tenant entity and rent income by the landlord entity. The property entities are relevant primarily because Plaintiffs' businesses used related-party property arrangements, and those arrangements affected rent, expense allocation, and basis issues.

5. *Kahl and Company*

Kahl and Company is at the center of the remaining disputed adjustments, both as an umbrella entity and as the vehicle through which Furniture Plus losses were claimed. Kahl and Company was treated by Plaintiffs as a broader family or umbrella entity. Bargouti testified that Kahl envisioned Kahl and Company as an enterprise under which family business activities could be organized.

During 2015 and 2016, however, Kahl and Company's reported activity was limited. Its returns include pass-through losses from other entities, including Furniture Plus and Light Up the Sky, and Plaintiffs also associated some production-related expenses with Bolt Films.

Defendant questioned that treatment. Warren testified that Kahl and Company was reported as a property management company, while Bolt Films appeared to involve a separate production or media activity. Defendant did not find separate filings for Bolt Films, did not identify income reported from that activity, and did not receive sufficient records to determine the full scope of the activity, including payroll, contractor payments, depreciation, or income connected to the productions.

Warren testified that Kahl and Company was described as a property management company. She performed a bank deposit analysis showing total deposits of $26,348, including an unexplained $1,000 deposit from "Saudi Refining," which was added to income when no explanation was provided. She noted that Defendant did not adjust for another unexplained $500 deposit.

Kahl and Company is also central to the Furniture Plus basis issue. Furniture Plus reported Kahl and Company as a 90 percent owner. Plaintiffs claimed the Furniture Plus losses flowed through to Kahl and Company and then affected Plaintiffs' tax liability. Defendant disallowed the disputed Furniture Plus losses flowing to Kahl and Company because Plaintiffs did not provide underlying records sufficient to establish Kahl and Company's basis in Furniture Plus.

6. *Bolt Films*

Kahl testified that he formed Bolt Films in approximately 2012 for entertainment and production related activity and that Bolt Films was treated as a DBA or assumed business name

of Kahl and Company. He described Bolt Films as responsible for production, marketing, video, website, and promotional work for the related businesses. Kahl testified that substantial purchases from vendors such as B&H Photo, Barn Door Lighting, Stage Lighting Store, and video copilot related to film, lighting, video editing, or production activity. Some of those expenses were recorded on Biogen's books or paid with Biogen credit cards, even though Kahl acknowledged they were not Biogen expenses. He explained that Biogen's credit cards were often used to pay expenses for other related entities because those cards were the primary available credit cards.

Defendant questioned the tax treatment of Bolt Films. Warren testified that Plaintiffs described Bolt Films as a DBA of Kahl and Company, but Defendant did not receive separate tax returns, books, bank statements, or credit card statements for Bolt Films. Defendant observed that some entries appeared related to Bolt Films and Kahl and Company's books but were on the records of other related entities. Warren also testified that she found evidence online of videos or productions associated with Bolt Films but could not identify income reported from those projects.

Defendant also questioned whether the records showed the full business structure of the production activity. Warren testified that she saw references to individuals associated with Bolt Films and to actors, dancers, or production personnel but did not find complete payroll, contractor, wage, or 1099 records corresponding to that activity. She also testified that some equipment appeared to be production related but did not appear on Kahl and Company's depreciation schedule, while other production-related expenses appeared on records for other entities.

/ / /

The court finds that Plaintiffs established that Bolt Films was an intended or developing production activity associated with Kahl and Company and that some production-related purchases were made. Plaintiffs did not, however, provide sufficient records to determine the scope of Bolt Films' business activity, the income generated from that activity, the proper entity to which the expenses belonged, or whether the disputed production-related expenses were properly deductible by the entity that claimed them.

7.     *Light Up the Sky*

Light Up the Sky is an entity connected to film or production activity. Kahl and Company held a minority interest in Light Up the Sky. Warren testified that Kahl and Company held a 6 percent capital interest related to a $30,000 investment and that the primary owners were individuals in Washington. Bargouti testified that Kahl and Company reported a pass-through loss from Light Up the Sky, which Defendant allowed.

A separate issue arose concerning a $10,000 payment from Celebrity Tan to Light Up the Sky. The check memo described the payment as advertising, and Bargouti testified that it related to product placement or marketing. Warren testified that Light Up the Sky reported no income for 2015 and that, if the payment was advertising income, she would have expected corresponding income on Light Up the Sky's return. She also testified that Kahl and Company's records indicated a $30,000 investment arrangement and that the $10,000 payment appeared to be part of that funding.

The court treats Light Up the Sky primarily as an investment and production related entity. The disputed treatment of the $10,000 payment is relevant mainly because it shows the difficulty of tracing payments among related entities and distinguishing advertising expenses from investment contributions.

8.  *Furniture Plus*

Furniture Plus operated a retail furniture business at a location identified as the "Halsey Street property." Kahl testified that the furniture store was created in connection with his effort to preserve the family property and generate rent for the related property entity. He described Furniture Plus, Kahl Properties, and Kahl and Company as related pieces of the same broader business structure. Furniture Plus was intended to operate from the Halsey Street property and pay rent while the related property entity held or managed the building, and Kahl and Company was intended to serve as a broader holding or umbrella company.

Furniture Plus reported losses for the years at issue. Plaintiffs claimed that those losses flowed through to Kahl and Company, which held a 90 percent ownership interest in Furniture Plus, and that those losses affected Plaintiffs' tax liability. Bargouti testified that the Furniture Plus K-1s and capital account schedules showed positive capital accounts and that, from an accounting perspective, Kahl and Company had sufficient basis to claim the pass-through losses. He explained that the Furniture Plus returns showed beginning capital, additional contributions, losses, and ending capital, and that the same ending capital amount was reflected on Kahl and Company's books as its investment in Furniture Plus.

Bargouti also explained the distinction between inside basis and outside basis. He acknowledged that the figures shown on the Furniture Plus returns and K-1s reflected inside basis or capital account information, not a separately prepared outside basis calculation. He testified, however, that he could not identify a reason why Kahl and Company's outside basis would be different from the reported capital account figures, and he reasoned that even if basis began at zero, the reported capital contributions would create at least some basis to absorb losses.

/ / /

Defendant did not accept the Furniture Plus basis figures reported on the returns and K-1s as sufficient proof of tax basis. Warren testified that, in an audit, Defendant generally requests basis calculations from the taxpayer, together with supporting records showing contributions, distributions, income, losses, non-deductible expenses, and other items affecting basis. She testified that the taxpayer is responsible for tracking basis and that Defendant expects the taxpayer to provide source documents supporting the claimed basis calculation.

Warren identified transfers from Biogen to Furniture Plus, including an $18,000 transfer, but testified that Biogen was not an owner of Furniture Plus. As a result, Defendant could not determine whether such transfers created basis for Kahl and Daniel Kahl, Biogen, Kahl and Company, or some other person or entity. Warren testified that, because money moved among the related entities without ownership agreements or records explaining how the transfers should be treated, Defendant could not determine basis with reasonable accuracy.

Warren testified that she performed a bank deposit analysis for Furniture Plus to verify income. She identified total deposits of $206,410 and unexplained deposits of $3,999, which were treated as taxable when no explanation was provided. She noted that Defendant requested all bank account statements and received those it was aware of but still had concerns about missing accounts and unexplained deposits.

The court finds that Plaintiffs established that the Furniture Plus returns and K-1s reported positive capital account balances and pass-through losses. Plaintiffs did not, however, prove the underlying tax basis supporting those amounts. Plaintiffs did not provide sufficient source records to verify Kahl and Company's or Kahl's basis in Furniture Plus, including records showing the origin and treatment of contributions, distributions, intercompany transfers, ownership changes, and beginning basis. The court therefore finds that Plaintiffs did not prove

basis in Furniture Plus in an amount sufficient to require allowance of the disputed pass-through losses.

9.       *Other disputed expense categories*

Kahl acknowledged that his recordkeeping practices were imperfect, particularly with respect to receipts and a lack of mileage logs.  He testified that receipts were often lost, faded, or misfiled, and that he relied on credit card statements, email records, and his own memory to reconstruct expenses.  Kahl testified that due to cash flow constraints, expenses were sometimes paid by one entity on behalf of another.  He stated that these were later reconciled through accounting adjustments and that no expenses were double counted.

Automobile expenses were based on gas or other invoices such as insurance, but Plaintiffs did not keep mileage logs.  Kahl testified that his wife, Panayiota Kahl, assisted with business operations, including sample pickups and errands.  She was not an owner of any entity but was a W-2 employee during part of the relevant period.

Meals and entertainment also presented challenges.  Kahl testified that some restaurant or food purchases were related to travel, client meetings, employee meals, or sample collection for testing.  Defendant accepted that some food purchases could relate to testing, but Warren testified that she generally would not expect testing-related purchases to be recorded as meals and entertainment but rather as supplies or cost of goods sold.  Warren also testified that some meal receipts could not be tied to a contract, invoice, or other business activity for any of the related entities.

The court finds that Plaintiffs established plausible business explanations for some travel, meals, entertainment, and auto expenses.  However, Plaintiffs did not consistently provide the contemporaneous records needed to connect disputed entries to a specific business purpose,

vehicle, trip, client, project, or entity. As with the other categories, the issue is not whether such expenses can ever be ordinary and necessary business expenses but rather whether Plaintiffs proved the disputed amounts for the taxpayer and year at issue.

    a.    Advertising and promotional expenses

Plaintiffs claimed advertising and promotional expenses for several businesses, particularly Celebrity Tan and the related spa business. Kahl testified that retail businesses require advertising and that Celebrity Tan used advertising, promotional materials, banners, events, and social media promotions to attract customers. Some advertising expenses, such as Clipper magazine and certain banner printing expenses, were identified as Celebrity Tan promotional expenses.

Defendant allowed some advertising expenses but disallowed others where the records did not identify the entity, campaign, or business purpose. Warren testified that she allowed T&T Marketing expenses where an invoice showed the expense was for Celebrity Tan but disallowed Facebook charges where no invoices were provided showing whether the charges related to Celebrity Tan, Bolt Films, or another entity. She testified that the Kahl entities had multiple businesses with possible advertising activity, including Bolt Films, and that the Facebook charges could not be assigned without invoices or similar records.

    b.    Telephone, internet, and communications

Plaintiffs claimed telephone, cell phone, internet, and cable expenses. Kahl testified the cell phones were integral to his business activities because he communicated with clients, employees, vendors, and his brothers across multiple entities. He testified that the T-Mobile expenses included multiple phones, including his phone, his wife's phone, and phones used by others involved in the businesses. Kahl estimated that 95 percent of his cell phone use was for

business.  He acknowledged that the cell phone bills included multiple lines, including for his wife, and that some personal use occurred.

The T-Mobile records showed payments and phone-related charges but did not show how many phones were in use, the names of the users, or any information regarding the percentage of business versus personal use.

c.  Travel, automobiles, meals, and entertainment

Kahl acknowledged that he did not keep logs for travel and automobile expenses and only minimally maintained records of meal expenses.  He testified that business purposes could often be identified from credit card statements, coupled with his own memory.  For restaurant charges, he testified generally that expenses related to client entertainment, employee meals, business development, travel meals, or product testing would require verification with emails, which he did not have readily available.

Kahl gave plausible business explanations for some travel, meals, and entertainment expenses.  However, the testimony often remained general and did not consistently connect disputed entries to a particular client, trip, project, employee, event, or entity.

d.  Grow World, hydroponics, and Vista rent

A large, disputed category involved purchases from Grow World, a hydroponics supplier.  Defendant questioned those purchases because the receipts include grow lights and related supplies.  For example, one receipt included ten Gavita Pro 1000-watt lights, which Kahl acknowledged were grow lights.  The receipts also included items such as wall mounted fans, inline fans, carbon filters, nursery pots, dehumidifiers, controllers, regulators, and fertilizer products.

/ / /

Defendant considered Biogen's electricity usage at the Vista property. Warren testified that a Biogen PGE bill showed average daily electricity use increasing from a little over 61 kWh per day in February 2016 to approximately 600 kWh per day in June and July 2016 and that the December 2016 bill showed average use of 557.4 kWh per day and total usage of 17,280 kWh for the month. Warren testified that the amount and increase in electricity usage contributed to her concern about the Grow World purchases and Vista-related expenses.

Plaintiffs disputed Defendant's inference. Kahl testified that Biogen was expanding its laboratory operations at the Vista property and that cannabis testing created new business opportunities in Oregon during that period. Warren testified that Kahl did not hold a grower license or a license that would allow Biogen to verify and test marijuana samples.

Plaintiffs maintained that the Grow World purchases were related to Biogen's legitimate laboratory or testing activities, including work involving plants. Plaintiffs calculated that 2016 Grow World-related expenses totaled approximately $27,675, with some amounts classified as supplies and some as repairs or maintenance. Bargouti also testified that Defendant disallowed Biogen's 2016 rent category, totaling $58,000, in connection with Defendant's concerns about the Vista property and alleged grow operations.

The court finds that the Grow World purchases were not adequately explained by the vendor's name alone. Plaintiffs provided a possible business explanation, but the disputed purchases required reliable records connecting the items to Biogen's laboratory work, specific testing projects, or other deductible business activity. The court need not find that Plaintiffs operated an illegal grow operation to conclude that Plaintiffs bore the burden to substantiate the claimed business purpose and treatment of those expenses.

/ / /

e.  Outside services, wages, and Forms 1099

Plaintiffs claimed outside services, contractors, and wage-related payments for several businesses.  Kahl testified that some workers were paid by manual check as independent contractors, while payroll employees were processed through ADP.  He testified that he prepared federal Forms 1099 by paper, using forms purchased from an office supply store, and mailed Forms 1099 and Forms 1096 to the Internal Revenue Service (IRS).  He also testified that he did not know Oregon required separate electronic filing of Forms 1099 for the years at issue and did not mail or electronically file those forms with Oregon.

Warren testified that Defendant disallowed certain outside service expenses because Plaintiffs did not prove that the required Forms 1099 were filed with the IRS and Oregon.  For 2016, she testified that Defendant sent a letter giving Plaintiffs 30 days to file with Oregon before disallowing the expenses.  She further testified that Plaintiffs provided some Forms 1099 during discovery but not Forms 1096 showing their IRS filing, and that some copies appeared to be the copies that should have been filed with the IRS.  Defendant also checked the IRS and Oregon systems and did not find records confirming the filings.  The total payroll for Celebrity Tan and related entities in 2016 was approximately $300,000.

The court finds that Plaintiffs proved some payments were made to workers or service providers, but Plaintiffs did not consistently prove that the payments were properly reported or that the claimed outside service deductions satisfied the statutory or substantiation requirements applicable to those expenses.

B.  *Bargouti's Role in Reconstructing the Books*

Bargouti is a CPA who began assisting Plaintiffs' businesses around 2014-2015.  His responsibilities included preparing tax returns, reconstructing books, and advising on accounting

classifications for Biogen and the Celebrity Tan entities. For tax year 2015, he prepared returns using spreadsheets compiled by Kahl from check registers and credit card statements. During audit proceedings, Bargouti determined this method lacked a complete audit trail and reconstructed the 2015 books from bank and credit card statements to provide transaction-level support. For tax year 2016, his office implemented formal bookkeeping in QuickBooks based on bank statements, credit card statements, and ADP payroll reports, replacing the prior spreadsheet approach.

Because certain credit cards and accounts were used across entities, Bargouti employed QuickBooks "class" tracking to segregate transactions by entity and posted offsetting constructive distribution/contribution entries so that expenses appeared on the correct entity's books. He followed a rule that charges on Danny Kahl's Citibank card were treated as Celebrity Tan expenses and charges on Kahl's card as Biogen expenses, acknowledging that misclassifications occurred and were corrected during reconstruction. In 2016, Bargouti determined that all banking activity operated under the parent EIN for Celebrity Tan with sub-accounts for each location. He maintained one QuickBooks file with class-level separation and reported under Celebrity Tan for 2016, while preserving location detail.

Bargouti reconciled payroll and employer payroll taxes to ADP reports. He reduced ledger wages by approximately $14,000 to match ADP totals and treated any excess as adjustments. Utilities for Kahl's home office were addressed at the entity level, and Kahl did not take a separate home office deduction on his personal return. Interest from the Bank of America business credit card was recorded based on monthly statements. For 2015, Bargouti proposed removing a $7,651 adjusted entry carried from the original return, leaving only statement-supported interest of approximately $2,371. For 2016, interest included Bank of America/Citi

card charges and interest on a Beneficial Bank commercial line of credit for the Vista property. Origination charges on the Beneficial Bank line of credit were classified as loan fees rather than principal advances.

Bargouti capitalized and depreciated significant items such as HVAC, fencing, and leasehold improvements. He carried forward depreciation for a 2012 Progress Ridge leasehold improvement (basis approximately $52,972; annual amortization $3,532), which was calculated by tax software. Progress Ridge had three separate PGE accounts, and Mall 205 had one account. Large round payments were applied across these accounts, which did not match monthly billing statements. Bargouti testified that only three statements were obtained; PGE could not provide the closed Mall 205 account statements despite his requests. He coded numerous items as owner draws/distributions (e.g., Netflix, restaurants, OMSI, 7-Eleven, Amazon personal purchases). The reconstructed books did not categorize these as deductible expenses. Bargouti identified and corrected keying errors (e.g., interest posted to "insurance" due to QuickBooks autofill) and proposed striking unsupported entries such as the 2015 interest adjustment. In response to audit developments, Bargouti prepared an amended 2016 return based on reconstructed data. Defendant did not accept the amendment but referenced it in correspondence.

Bargouti testified that he personally reviewed each of the income and expense items for the multiple business entities involved in this case. He tracked intercompany transfers and allocations in QuickBooks and ultimately assigned those expenses to the appropriate entity. Bargouti testified that he reclassified personal expenses identified during the reconstruction as draws and did not deduct them. He further testified that the reconstructed books for 2015 resulted in a net income figure within $3,000 of the originally filed return. Bargouti testified that

Defendant did not challenge the authenticity of the reconstructed books but questioned the substantiation and business purpose of many individual expenses.

C.      *Defendant's Auditor and Workbooks*

Warren testified that she is a Revenue Supervisor with the Oregon Department of Revenue and has worked for Defendant for approximately seventeen years, conducting hundreds of personal income tax audits during that time. She became involved in this case through a filing enforcement lead concerning companies and individuals who had not filed returns. Warren confirmed familiarity with the tax returns and supporting documentation for Kahl for tax years 2015 and 2016 and described her preparation for testimony, which included reviewing documents, spreadsheets, receipts, and returns.

Warren prepared workbooks analyzing each business involved in the audit. She started with Plaintiffs' reconstructed books and organized the information by profit and loss category, then added her analysis identifying amounts allowed, disallowed, or adjusted. The workbooks used color coded tabs; green tabs generally reflected categories where Defendant accepted the reconstructed book amounts, while yellow tabs reflected categories where Defendant made further adjustments or continued to dispute Plaintiffs' reconstructed books. She noted that the reconstructed books differed from the filed returns in several respects, including cost of goods sold, advertising, auto, and rent expenses.

The court discusses Warren's substantive testimony in the sections addressing the relevant issues, including the workbooks, entity allocation, Furniture Plus basis, advertising and promotional expenses, Grow World purchases, communication expenses, and outside service/1009 adjustments. The court does not treat Warren's workbooks as proof by themselves. The workbooks serve as the organizing framework for evaluating the evidence. They help the

court determine whether Plaintiffs met their burden to prove that Defendant's disputed adjustments were incorrect. They also help the court determine whether Defendant met its burden on any increase in deficiency or other adjustment for which Defendant bears the burden of proof.

Warren testified that many expenses were disallowed because they lacked invoices, proof of payment, or documentation of business purpose. She emphasized that Defendant allowed expenses where substantiation was provided and disallowed those where it was not, consistent with statutory requirements. She also expressed concerns about commingling of expenses among entities and the absence of documentation for Bolt Films and Light Up the Sky, which reported no income despite evidence of operations.

### III. ANALYSIS

A. *Parties' Positions*

Plaintiffs ask the court to reverse Defendant's adjustments except where they have expressly conceded an item. They assert that they operated legitimate businesses, incurred ordinary and necessary business expenses, and proved their case through testimony, reconstructed books, tax returns, bank records, receipts, invoices, and other admitted documents. Although acknowledging imperfect records, they argue that their overall presentation meets the preponderance standard.

Plaintiffs also contend that Defendant applied an unduly rigid substantiation standard and that many expenses are clearly business-related when viewed in context, even without complete receipts or contemporaneous logs. They further maintain that inter-entity payments were properly reflected through reconstructed books and accepted accounting methods, including allocations, capital contributions, deemed distributions, and related party payments.

They specifically challenge Defendant's treatment of basis and related party activity, arguing that returns, K-1s, balance sheets, and capital account schedules establish sufficient basis for the disputed Furniture Plus pass-through losses. Plaintiffs also dispute Defendant's implication that Biogen's Vista property was used for an unlawful grow operation, asserting instead that the property and related purchases were tied to Biogen's laboratory and testing business.

Defendant argues that Plaintiffs failed to meet their burden of proof. While not disputing that Plaintiffs operated real businesses or that some expenses were allowable, Defendant asserts that many disputed deductions, losses, basis amounts, and allocations were not adequately tied to reliable records.

Defendant states that the auditor used Plaintiffs' reconstructed books as a starting point, allowing expenses supported by adequate documentation and business purpose and disallowing those that were incomplete, inconsistent, unsupported, misallocated, or legally insufficient. Defendant further maintains that Plaintiffs did not establish basis in Furniture Plus, did not adequately substantiate certain Biogen expenses related to the Vista property, and did not meet statutory substantiation requirements for travel, meals, automobile expenses, and certain outside-service payments.

B.      *Governing Law and Burden of Proof*

Oregon defines taxable income by reference to the Internal Revenue Code (IRC), subject to Oregon-specific modifications not relevant here. ORS 316.007; ORS 316.022(6).[5] Under IRC section 162(a), taxpayers may deduct ordinary and necessary expenses paid or incurred in carrying on a trade or business.

---

[5] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

Conversely, IRC section 262 generally disallows deductions for "personal, living, or family expenses" not otherwise allowed under the code.

Plaintiffs bear the burden of proof and must establish their case by a preponderance of the evidence. ORS 305.427. A preponderance of the evidence means the greater weight of the evidence, or evidence that makes the asserted fact more likely true than not. When Defendant asserts an increase in deficiency or an additional adjustment beyond the assessment, Defendant bears the burden of proof as to that addition. *See Donohoe v. Dept. of Rev.*, TC-MD 150521N, 2016 WL 4446635 at *3 (Or Tax M Div, Aug 23, 2016).

Deductions, losses, and basis must be proved. A taxpayer claiming a deduction must show that the expense was paid or incurred, that it was ordinary and necessary to the taxpayer's trade or business, and that it was not personal or otherwise nondeductible. *See* IRC §§ 162(a), 262; *Welch v. Helvering*, 290 US 111, 115, 54 S Ct 8, 78 L Ed 212 (1933); *INDOPCO, Inc. v. Comm'r*, 503 US 79, 84, 112 S Ct 1039, 117 L Ed 2d 226 (1992). Taxpayers must also maintain records sufficient to establish the amount, character, and business purpose of claimed deductions, losses, credits, and basis items. *See* IRC § 6001; Treas Reg § 1.6001–1(a). Oregon law disallows deductions for wages or remuneration for personal services where the taxpayer fails to report the payments as required, unless the taxpayer establishes the statutory exception. ORS 305.217; ORS 314.360; IRC § 6041(a); Treas Reg § 1.6041-1(a)(2); *Miller v. Dept. of Rev.*, TC-MD 140085C, 2014 WL 3817584 (Or Tax M Div, Aug 4, 2014.)

Some expenses require heightened substantiation requirements. Travel, meals, entertainment, gifts, and listed property, including passenger automobiles, are subject to IRC section 274(d). For those expenses, the court may not estimate the deduction based only on generalized testimony or rough approximation. *See Ghardiri-Asli v. Comm'r*, 118 TCM (CCH)

355 (2019), 2019 WL 5423725 at *11 (US Tax Ct). The taxpayer must provide evidence establishing the amount, time, place, and business purpose of the expense and, where applicable, the business relationship of the persons involved. IRC § 274(d); Treas Reg § 1.274-5T(b), (c). If a taxpayer fails to meet these requirements, the deduction must be denied, even if the expense appears plausible or reasonable. *Schladweiler v. Comm'r*, 80 TCM (CCH) 681 (2000), 2000 WL 1690282 at *3 (US Tax Ct), *aff'd*, 28 F Appx 602 (8th Cir 2002).

Taxpayers may rely on testimony and documentary evidence, including reconstructed books, bank records, receipts, invoices, tax returns, schedules, and workbooks. But the burden remains on them to identify the evidence relied on and explain how it supported the claimed deduction, loss, basis, or allocation. ORS 305.427; ORS 314.425(1); *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990); *Tone v. Dept. of Rev.*, TC-MD 160063C, 2017 WL 728735 at *5 (Or Tax M Div, Feb 24, 2017). The court is not required to infer the claimed tax treatment merely from the existence of documents admitted into evidence.

This case involved thousands of pages of records and workbooks. The court admitted and considered the exhibits, but it does not undertake an independent transaction-by-transaction reconstruction of Plaintiffs' books. Before trial, the court directed the parties to use Plaintiffs' reconstructed books and Defendant's workbooks as the organizing framework for the presentation of evidence. Those workbooks do not prove the adjustments by themselves; they help the court identify the disputed items and evaluate whether the party bearing the burden of proof met that burden. Applying those standards, the court first addresses how it treats the reconstructed books and the voluminous evidentiary records before turning to specific disputed categories.

/ / /

C.      *Voluminous Records and Reconstructed Books*

Plaintiffs' central argument is that this case is primarily about imperfect accounting rather than failed substantiation.  The court agrees in part.  The evidence shows that Plaintiffs operated active businesses, incurred many real expenses, and later undertook a substantial effort to reconstruct their books.  The court does not find that Plaintiffs fabricated expenses.

But imperfect accounting and failed substantiation are not mutually exclusive.  A taxpayer may operate a real business and still fail to prove a disputed deduction, loss, basis amount, or allocation.  That is especially true where multiple related entities used overlapping accounts, expenses were paid by one entity and later allocated to another, personal and business expenses appeared on the same credit cards or bank accounts, and the reconstructed books depended heavily on later explanations rather than contemporaneous source records.

The court therefore does not decide this case by asking whether a claimed expense seems plausible in the abstract—most of the claimed expenses were plausible.  The question is whether Plaintiffs proved the specific tax treatment claimed for the disputed item: the amount, business purpose, year, entity, allocation, and, where applicable, basis or reporting requirement.

Nor does the court treat the admitted exhibits as an undifferentiated "big box of receipts" from which the court must reconstruct Plaintiffs' tax returns.  The court admitted and considered the exhibits.  But Plaintiffs bore the burden to identify the evidence on which they relied and explain how that evidence supported the claimed tax treatment.  The court is not required to search thousands of pages of records to determine which documents might support which disputed deduction, loss, basis amount, or allocation.

The court also need not decide the full scope of the *Cohan* Doctrine in modern substantiation cases.  Under that doctrine, where a taxpayer establishes that deductible expenses

were incurred but cannot substantiate the precise amounts, the court may approximate those expenses, bearing heavily against "the taxpayer whose inexactitude is of his own making." *Cohan v. Comm'r*, 39 F2d 540, 544 (2nd Cir 1930); *see also Vanicek v. Comm'r*, 85 TC 731, 742-43 (1985). Even where estimation is permitted, the court must have a reasonable evidentiary basis for making an approximation. *Cohan*, 39 F2d at 543-44; *Vanicek*, 85 TC at 743. Plaintiffs did not provide such a basis for many disputed items. In addition, estimation is not permitted for expenses subject to strict substantiation requirements under IRC section 274(d), including travel, meals, entertainment, and listed property such as passenger automobiles.

The court next addresses a related evidentiary problem; one closely tied to the reconstruction issues. This problem involves how expenses were paid and allocated among the related entities.

D.      *Inter-Entity Payments and Allocations*

The evidence shows that entities controlled by Kahl frequently paid expenses on behalf of one another. Funds were transferred among accounts, and expenses paid by one entity were years later reclassified to another during reconstruction of the books. That practice does not automatically defeat a deduction, but it requires proof. Plaintiffs had to show that the expense was ordinary and necessary to the business of the entity claiming the deduction or that the later allocation accurately reflected the substance of the transaction.

The court acknowledges that *Lohrke v. Comm'r*, 48 TC 679 (1967) and *West Covina Motors, Inc. v. Comm'r*, 96 TCM (CCH) 263 (2008), 2008 WL 4706469 (US Tax Ct) could support categorical disallowance of deductions claimed for expenses paid by a separate entity that had no direct business purpose for the expenditure. Both cases state that, as a general rule, taxpayers may not deduct the expenses of another as an ordinary and necessary business expense

under IRC section 162. *Lohrke,* 48 TC at 684; *West Covina Motors,* 2008 WL 4706469 at *4. The court does not apply that legal theory here. Defendant did not seek categorical disallowance at audit or at trial. Instead, Defendant accepted, at least in part, an allocation-based framework—categorizing, accepting, and adjusting inter-entity payments across the related entities. That approach, in several instances, supported adjustments favorable to Defendant's increased assessments. Having structured both the audit and the evidentiary presentation around an allocation framework, and with Plaintiffs' apparent assent, the court adopts that methodology. However, that methodology still requires that the parties meet their evidentiary burden of proof. Related party payments must still be traced, and the evidence must show who paid the expense, which entity incurred it, what the payment was for, and how the transaction affected the tax treatment claimed. As to Plaintiffs, that proof was often missing.

The court therefore does not reject Plaintiffs' deductions solely because one related entity initially paid an expense associated with another. Instead, the court evaluates whether Plaintiffs proved the claimed treatment after considering the reconstructed books, workbooks, testimony, and available source documents. Where Plaintiffs connected the payment to the proper entity and business purpose, the court gives that evidence weight. Where they did not, the inter-entity payment structure prevents the court from finding the claimed deduction, loss, allocation, or basis by a preponderance of the evidence.

The inter-entity payment problem is most acute in the Furniture Plus basis dispute, which the court addresses separately because it turns on a distinct legal question.

E.      *Furniture Plus Pass-Through Losses and Basis*

Furniture Plus presents a separate basis issue. Plaintiffs contend that Kahl and Company had sufficient basis in Furniture Plus to deduct the disputed pass-through losses. They rely

primarily on the Furniture Plus returns, K-1s, Schedule L balance sheets, Schedule M-2 capital account reconciliations, and Bargouti's testimony that the reported capital accounts showed positive equity. Bargouti's testimony has practical force—Furniture Plus could not continue operating while incurring losses unless cash, property, credit, or some other value was supplied to the business.

The court does not reject that economic premise. The difficulty is that basis is not established merely by showing that the business must have been funded *somehow*. Plaintiffs were obligated to prove who supplied the funds or value, in what amount, in what capacity, and how that transaction affected the basis of the taxpayer claiming the loss. *See* IRC §§ 704(d), 705(a); ORS 63.002. That proof was especially important here because funds moved among related entities with different ownership percentages. A transfer from Biogen to Furniture Plus, for example, does not automatically establish basis for Kahl and Company because Biogen was not an owner of Furniture Plus. Nor does the record establish whether such a transfer should be treated as a contribution, loan, reimbursement, payment of another entity's expense, distribution followed by contribution, or some other transaction.

Plaintiffs proved that the returns and K-1s reported positive capital accounts. They did not prove the underlying tax basis supporting those accounts. They did not provide ownership agreements, basis schedules, reliable beginning basis records, or sufficient tracing of contributions, distributions, and intercompany transfers. The court therefore finds that Plaintiffs did not prove Kahl and Company's or Kahl's basis in Furniture Plus in an amount sufficient to require allowance of the disputed pass-through losses.

///

///

Having addressed the overarching issues of evidentiary framework, inter-entity allocation, and Furniture Plus basis, the court turns to the category-by-category application of the substantiation and burden of proof standards set forth above.

F.      *Application by Category*

1.      *Utilities and rent*

The evidence shows that Plaintiffs' businesses incurred rent and utility expenses.  The Celebrity Tan businesses operated from leased locations, and Biogen used related-party property arrangements.  Defendant allowed many rent and utility expenses where contracts, invoices, or other reliable records supported the payment and business purpose.

For the remaining disputed items, Plaintiffs did not consistently establish the responsible entity, payor, property, business purpose, or allocation.  Where the record showed payment alone, without reliable allocation to the taxpayer claiming the deduction, Plaintiffs did not meet their burden.

2.      *Advertising and supplies*

Plaintiffs' evidence shows they incurred advertising and supply expenses in the operation of their businesses.  The court accepts that these businesses had a business reason to advertise. Defendant allowed some advertising expenses where the invoice or record identified the business purpose and entity.  However, much of the advertising and promotional expenses were not sufficiently substantiated.  Facebook charges were not consistently tied to invoices showing the campaign, entity, or business purpose.  Events and promotional expenses often involved cash receipts.

The court agrees with Defendant that those receipts did not prove deductibility where Plaintiffs did not provide till logs, point-of-sale records, or reimbursement records (the source of

the cash, whether employees were reimbursed, and whether the cash was included in reported income).

The court therefore allows advertising and promotional expenses only to the extent they were conceded by Defendant in its workbooks. Plaintiffs did not meet their burden for disputed advertising, events, food, decoration, or promotional material expenses supported only by generalized testimony, cash receipts without a cash trail, or records that did not identify the proper entity.

3. *Telephone, internet, and communications*

Plaintiffs established that the businesses needed telephones, internet, cell phones, and communication services. Kahl testified that he used a cell phone and internet services to communicate with clients, employees, vendors, and his brothers. But proof of a phone or internet bill on a credit card statement does not establish the deductible business portion of those expenses. Some records did not identify the users, how many phones, or the business use percentages. Internet services connected at a home location with possible additional services do not establish the business percentage of use. Where Plaintiffs failed to prove business use and entity allocation, they did not meet their burden of the disputed communication expenses.

4. *Travel, meals, and automobile expenses*

Travel, meals, entertainment, and automobile expense are subject to strict substantiation requirements under IRC section 274(d). Plaintiffs did not keep mileage logs and did not consistently maintain contemporaneous records showing the time, place, business purpose, and business relationship for disputed travel, meal, and automobile expenses.

Kahl gave plausible explanations for some items. He testified that restaurant charges could relate to client meetings, employee meals, business development, travel meals, or sample

collection for testing.  Plausibility is not enough for expenses governed by section 274(d).  Credit card statements, fuel receipts, and generalized testimony do not satisfy strict substantiation.  Plaintiffs therefore did not meet their burden for disputed travel, automobile, meals, and entertainment expenses except to the extent Defendant allowed them or the record contains the required substantiation

5.      *Grow World, hydroponics and Vista property expenses*

The Grow World purchases, and Vista-related expenses identified the items purchased, but Plaintiffs did not reliably connect those items to specific Biogen testing work.  Defendant questioned the purchases because receipts showed grow lights, fans, filters, dehumidifiers, pots, regulators, and similar hydroponic equipment.  Defendant also considered Biogen's electricity usage at the Vista property, which increased sharply during 2016.  Plaintiffs disputed Defendant's inference and maintained that Biogen was expanding laboratory operations and exploring cannabis-related testing opportunities.

The court need not decide whether Plaintiffs operated an unlawful grow operation.  Defendant's suspicion does not, by itself, prove nondeducibility.  But Plaintiffs bore the burden to prove that the disputed Grow World purchases and related Vista expenses were ordinary and necessary expenses of Biogen's laboratory or testing business.  Plaintiffs did not adequately connect those purchases to specific testing projects, clients, contracts, invoices, or other business records.  Plaintiffs therefore did not meet their burden for the disputed Grow World and related Vista expenses.

6.      *Contract labor, outside services, and Forms 1099*

Plaintiffs made payments characterized as contract labor or outside services.  Some payments may have been made for real services, but that does not end the inquiry.  Oregon law

disallows deductions for wages or remuneration for personal services where the taxpayer fails to report the payments as required, unless the taxpayer establishes the statutory exception.

Kahl testified that he prepared paper Forms 1099 for some workers and mailed federal forms, but he acknowledged that Plaintiffs did not file the required Oregon information returns. Warren testified that Defendant gave Plaintiffs an opportunity to file for 2016 before disallowing the expenses, that some Forms 1099 provided in discovery appeared not to have been filed with the IRS, and that Defendant could not verify filing through IRS or Oregon systems. Plaintiffs did not prove reasonable cause or circumstances beyond their control for the failure to file.

The denial of deductions for payments to workers is a harsh result where services may have been performed. Oregon law nevertheless makes required information reporting part of the deductibility inquiry. Plaintiffs did not meet their burden to show that the disputed outside service and wage-related deductions satisfied those requirements.

## IV. CONCLUSION

The court does not find that Plaintiffs operated sham businesses or fabricated expenses. The evidence shows that Plaintiffs operated real businesses, incurred many real expenses, and made a substantial effort through their CPA to reconstruct disorganized records. The evidence also shows that Defendant did allow many deductible items where the documentation was adequate.

But deductions, losses, basis, and allocations must be proved. Plaintiffs' reconstructed books and testimony often provided plausible explanations, but they did not consistently provide the source records, tracing, entity allocation, strict substantiation, information reporting, or basis proof required to allow the disputed items. Plaintiffs therefore did not meet their burden of proof.

Defendant's workbooks do not prove the adjustments by themselves. They serve as the organizing framework for evaluating the evidence. On this record, Defendant has met its burden on any increase in deficiency or other adjustment for which Defendant bears the burden of proof.[6]

Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs Nidal Kahl and Panayiota Kahl's appeal is denied.

IT IS FURTHER THE DECISION OF THIS COURT that Defendant's cross-claim to increase the deficiency is granted.

_____
RICHARD D. DAVIS
MAGISTRATE

***To appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court. Appeals are accepted by electronic filing; by mail at 1163 State Street, Salem, OR 97301-2563; and by hand delivery to 1241 State Street, Salem, OR, Floor 4R.***

***Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed. TCR-MD 19 B.***

***This document was signed by Magistrate Richard D. Davis and entered on July 2, 2026.***

---

[6] Defendant's workbook figures are in Attachment A to this Decision

Attachment A

| | 2015 Nidal | | | | |
|---|---|---|---|---|---|
| | Return | Audit | Conference | Magistrate | Adjustment |
| Wages | $159,848.00 | $159,848.00 | $159,848.00 | $159,848.00 | $0.00 |
| Taxable Refunds | $7,241.00 | $7,241.00 | $7,241.00 | $7,241.00 | $0.00 |
| Capital Gain | $0.00 | $127,006.00 | $142,000.00 | $142,000.00 | $142,000.00 |
| Divdends | $0.00 | $104.00 | $104.00 | $104.00 | $104.00 |
| Interest | $0.00 | $0.00 | $12.00 | $9.00 | $9.00 |
| Schedule E: | | | | | |
| Celebrity Tan non passive loss | -$92,379.00 | $34,253.00 | -$40,874.00 | -$12,906.40 | $79,472.60 |
| Biogen Flow Through Adjustment | $109,320.00 | $240,103.00 | $167,715.00 | $159,637.94 | $50,317.94 |
| Biogen Passive income | $9,240.00 | $9,240.00 | $9,240.00 | $9,240.00 | $0.00 |
| Biogen 179 deduction | -$39,093.00 | -$39,093.00 | -$39,093.00 | -$39,093.00 | $0.00 |
| Furniture Plus Flow through adjustment | $0.00 | $1,521.00 | -$2,510.00 | -$2,510.00 | -$2,510.00 |
| | | | -$2,097.00 | -$2,097.00 | |
| Kahl & Co non passive loss | -$54,310.00 | $0.00 | -$16,990.00 | -$17,288.10 | $37,021.90 |
| Kahl & Co passive income | $15,300.00 | $15,300.00 | $16,200.00 | $16,200.00 | $900.00 |
| Kahl & Properties passive loss | -$24,540.00 | $20,625.00 | $0.00 | $0.00 | $24,540.00 |
| Kahl & Properties non passive loss | -$59.00 | -$59.00 | -$59.00 | -$59.00 | $0.00 |
| Personal Rental Loss | -$1,266.00 | -$1,266.00 | -$1,266.00 | -$1,266.00 | $0.00 |
| | $0.00 | $9,000.00 | $0.00 | $0.00 | $0.00 |
| Return Discrepancy | $0.00 | -$6,403.00 | $0.00 | $0.00 | $0.00 |
| Schedule E total | -$77,787.00 | $283,221.00 | $90,266.00 | $109,858.44 | $189,742.44 |
| Other Income | $0.00 | $16,420.00 | $9,442.00 | $35,451.00 | $35,451.00 |
| | | | | | |
| Total Income | $89,302.00 | $593,840.00 | $408,913.00 | $454,511.00 | $365,209.00 |
| SE Tax | $0.00 | -$2,601.00 | -$258.00 | -$1,614.00 | -$263.00 |
| AGI | $89,302.00 | $591,239.00 | $408,655.00 | $452,897.00 | $363,595.00 |
| | | | | | |
| Oregon Return | | | | | |
| AGI | $89,302.00 | $591,239.00 | $408,655.00 | $452,897.00 | $363,595.00 |
| Taxable refunds | -$7,241.00 | -$7,241.00 | -$7,241.00 | -$7,241.00 | $0.00 |
| Itemized deductions | -$37,196.00 | -$28,870.00 | -$34,801.00 | -$33,732.00 | $4,068.00 |
| Taxable Income | $44,865.00 | $555,128.00 | $366,613.00 | $411,924.00 | $367,059.00 |
| | | | | | |
| Tax before credits | $3,567.00 | $52,238.00 | $33,575.00 | $38,060.00 | $34,493.00 |
| Exemption Credit | -$1,552.00 | -$194.00 | $0.00 | $0.00 | $1,552.00 |
| Kicker | -$1,056.00 | -$1,056.00 | -$645.00 | -$645.00 | $411.00 |
| Withholding | -$8,880.00 | -$8,880.00 | -$8,880.00 | -$8,880.00 | $0.00 |
| Refund | $7,921.00 | | | | |
| Tax after credits/withholding | | $42,108.00 | $24,050.00 | $28,535.00 | $36,456.00 |
| | | | | | |
| SU Penalty | | $10,006.00 | $6,312.00 | $7,127.00 | |

Attachment A

| | 2016 Nidal | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Original | Amdended | Audit | Conference | Magistrate | Adjustment |
| Wages | $133,306.00 | $133,306.00 | $133,306.00 | $133,306.00 | $133,306.00 | $0.00 |
| Capital Gain | | | $22,617.00 | $0.00 | $0.00 | $0.00 |
| Interest | | | | | $8.00 | |
| Dividends | | | | | $119.00 | |
| Other Losses | | -$2,005.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| NOL | -$4,182.00 | -$4,182.00 | $0.00 | $0.00 | $0.00 | $4,182.00 |
| Schedule E: | | | | | | |
| Celebrity Tan Flow Through | | -$179.00 | $365,367.00 | $91,946.00 | $85,493.00 | $85,493.00 |
| Biogen Flow Through Adjustment | $52,000.00 | $125,352.00 | $261,526.00 | $261,106.00 | $283,534.00 | $231,534.00 |
| Furniture Plus Flow through adjustment | | -$2,098.00 | $3,732.00 | $1,932.00 | $1,932.00 | $1,932.00 |
| Kahl & Co Flow through | | -$23,944.00 | $32,803.00 | -$799.00 | -$536.00 | -$536.00 |
| Kahl & Co passive rental income | | $7,202.00 | $7,202.00 | $7,202.00 | $7,202.00 | $7,202.00 |
| Rental Loss/Income | $0.00 | -$7,202.00 | $78,914.00 | $18,219.00 | $18,219.00 | $18,219.00 |
| **Schedule E total** | **$52,000.00** | **$99,131.00** | **$749,544.00** | **$379,606.00** | **$395,844.00** | |
| Other Income | | | | | $11,153.00 | $11,153.00 |
| | | | | | | |
| Total Income | $181,124.00 | $226,250.00 | $905,586.00 | $513,031.00 | $540,430.00 | $359,306.00 |
| SE Tax | $0.00 | -$1,651.00 | -$3,552.00 | -$3,523.00 | -$3,797.00 | -$3,827.00 |
| SE health insurance | $0.00 | -$14,133.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| AGI | $181,124.00 | $210,466.00 | $902,034.00 | $509,508.00 | $536,633.00 | $355,509.00 |
| | | | | | | |
| Oregon Return | | | | | | |
| AGI | $181,124.00 | $210,466.00 | $902,034.00 | $509,508.00 | $536,633.00 | $355,509.00 |
| Federal tax liability | -$6,500.00 | -$6,500.00 | $0.00 | $0.00 | $0.00 | $6,500.00 |
| Taxable refunds | | | | | | |
| Itemized deductions | -$29,991.00 | -$30,049.00 | -$16,248.00 | -$25,344.00 | -$24,822.00 | $5,169.00 |
| Taxable Income | $144,633.00 | $173,917.00 | $885,786.00 | $484,164.00 | $511,811.00 | $367,178.00 |
| | | | | | | |
| Tax before credits | $12,545.00 | $15,181.00 | $84,971.00 | $45,210.00 | $47,947.00 | $35,402.00 |
| Exemption Credit | -$1,365.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,365.00 |
| Withholding | -$8,379.00 | -$8,379.00 | -$8,379.00 | -$8,379.00 | -$8,379.00 | $0.00 |
| **Tax after credits/withholding** | **$2,801.00** | **$6,802.00** | **$76,592.00** | **$36,831.00** | **$39,568.00** | **$36,767.00** |
| | | | | | | |
| Penalty | | | $14,758.00 | $6,806.00 | $7,353.00 | |